*Formatted for Electronic Distribution*                                                        *For Publication*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF VERMONT**

Filed & Entered
On Docket
November 4, 2014

In re:

    **A. Paul Gutierrez,**
           **Debtor.**

**Chapter 7 Case
# 13-10775**

*Appearances:*  *Heather Z. Cooper, Esq.*                *Elizabeth Marie Demas, Esq.*
              *Kenlan Schwiebert Facey & Goss, P.C.*     *Clarke Demas & Baker, PLLC*
              *Rutland, VT*                            *Burlington, VT*
              *For the Debtor*                       *For the Creditor*

**MEMORANDUM OF DECISION
GRANTING DEBTOR'S MOTION FOR SUMMARY JUDGMENT
AND DENYING CREDITOR'S MOTION TO DISMISS CHAPTER 7 CASE**

Catamount Holding Co., II, a creditor in this case, has filed a motion to dismiss Mr. Gutierrez's bankruptcy case, alleging Mr. Gutierrez's filing of this case was an abuse of the bankruptcy system. Catamount also alleges Mr. Gutierrez filed his bankruptcy petition in bad faith, and misrepresented information in his bankruptcy schedules to mislead the Court into believing (1) his debts are primarily business debts, (2) he qualifies for relief under Chapter 7, and (3) he is entitled to bankruptcy relief in this District. In response, Mr. Gutierrez filed a motion for summary judgment, seeking denial of Catamount's motion to dismiss, and arguing that the undisputed material facts demonstrate he filed his petition in good faith, he did not manipulate information in his schedules, and he has the right to Chapter 7 bankruptcy relief in the District of Vermont. For the reasons set forth below, the Court finds there are no material facts in dispute, summary judgment is proper, and Mr. Gutierrez is entitled to judgment denying the motion to dismiss this case.

**I. JURISDICTION**

This Court has jurisdiction over the motion for summary judgment pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Order of Reference entered by Chief Judge Christina Reiss on June 22, 2012. The Court declares the claims addressed by the instant motion to be core matters under 28 U.S.C. § 157(b)(2)(A), (B), and (O), over which this Court has constitutional authority to enter a final judgment.

1

## II. ISSUES PRESENTED

The Court must first determine whether there are any material facts in dispute and, if not, must then determine whether the undisputed material facts establish that A. Paul Gutierrez (the "Debtor") is entitled to judgment as a matter of law denying the motion to dismiss filed by Catamount Holding Co., II (the "Creditor"). To adjudicate whether the Debtor is entitled to judgment, the Court must determine whether the record establishes that (i) the Debtor is eligible to commence a bankruptcy case in the District of Vermont, (ii) dismissal is not warranted under 11 U.S.C. § 707(a) based upon bad faith, and (iii) dismissal is not warranted under 11 U.S.C. § 707(b) for abuse of the provisions of Chapter 7.

### III. PROCEDURAL HISTORY PERTINENT TO THE SUMMARY JUDGMENT MOTION

The contested matter before the Court has been aggressively litigated, including numerous discovery disputes and multiple motions to strike pleadings from the record. In the interest of brevity, the Court sets forth here the procedural history only to the extent it is relevant to the instant motion.

On November 5, 2013, the Debtor filed a voluntary Chapter 7 petition for relief (doc. # 1). Two months later, on January 9, 2014, the Creditor filed a motion to dismiss the case for abuse under 11 U.S.C. § 707(b)[1] (doc. # 10) (the "Motion to Dismiss").  On February 18, 2014, the Debtor filed an opposition to the Motion to Dismiss (doc. # 17), and on March 4, 2014, the Creditor filed a supplement to its motion (doc. # 23). On March 14, 2014, the Court entered an Order to clarify the scope of litigation (doc. # 27).

On July 14, 2014, the Debtor filed a motion for summary judgment with a statement of undisputed material facts, seeking dismissal of the Creditor's Motion to Dismiss (doc. ## 57, 57-14) (the "Summary Judgment Motion" and "SUMF" respectively). On August 28, 2014, the Creditor filed its memorandum of law in opposition to the Debtor's Summary Judgment Motion and a response to the Debtor's SUMF, in one pleading (doc. # 64) (the "Opposition" and "Response," respectively). Finally, on September 5, 2014, the Debtor filed replies to the Opposition and Response (doc. ## 72, 73) (the "Replies"). At that point the Court deemed the matter fully submitted.

### IV. LEGAL STANDARD FOR SUMMARY JUDGMENT RELIEF

Summary judgment is proper if the record shows no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Fed. R. Bankr. P. 7056; see also Bronx Household of Faith v. Bd. of Educ. of the City of New York, 492 F.3d 89, 96 (2d Cir. 2007). The moving party bears the burden of showing that no genuine issue of material fact exists. See Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). A genuine issue

---

[1]   Although captioned as a motion to dismiss under § 707(b), the motion alleges both abuse, properly resolved under § 707(b), and good faith, properly resolved under § 707(a), as discussed below.

exists only when "the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); see also Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The substantive law identifies those facts that are material; only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. See Anderson, 477 U.S. at 248. Factual disputes that are irrelevant or unnecessary are not material. Id. In making its determination, the court's sole function is to determine if there is any material dispute of fact that requires a trial. Id. at 249; see also Palmieri v. Lynch, 392 F.3d 73, 82 (2d Cir. 2004). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the moving party. Scott v. Harris, 550 U.S. 372, 378 (U.S. 2007); see Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc., 448 F.3d 573, 579 (2d Cir. 2006).

If the moving party meets its initial burden, the burden then shifts to the nonmoving party to come forward with evidence sufficient to create a genuine dispute as to a material fact for trial. First Am. Title Ins. Co. v. Moses (In re Moses), 2013 Bankr. LEXIS 2917, *13-14 (Bankr. E.D.N.Y. 2013). To meet this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory or based on speculation. Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310-312 (2d Cir. 2008). Rather, the nonmoving party must present "significant probative evidence" that a genuine dispute of fact exists. Anderson, 477 U.S. at 249 (citation and internal quotation marks omitted). If the nonmoving party does not come forward with specific facts to establish an essential element of that party's claim on which it has the burden of proof at trial, the moving party is entitled to summary judgment. See Celotex Corp., 477 U.S. at 323-25 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case"); see also Tufariello v. Long Island R. Co., 458 F.3d 80, 85 (2d Cir. 2006). If the movant produces sufficient evidence to support its asserted inference, and the respondent fails to produce significantly probative evidence to counter the inference, disposition by summary judgment may be appropriate even though subjective factors such as motive or intent are the fact issues in question. Towle v. Hendrix (In re Hendrix), 352 B.R. 200, 204-205 (Bankr. W.D. Mo. 2006).

## V. DISCUSSION

### A. ARE THERE ANY MATERIAL FACTS IN DISPUTE?

The Creditor asserts that there are material facts in dispute. In his Replies, the Debtor argues that the Creditor's Opposition and Response asserting such alleged disputes are not supported by competent summary judgment evidence, and asks the Court to treat his SUMF as unopposed. See doc. ## 72, 73. In order to ascertain if the first prong of the summary judgment test – whether there are no material fact in dispute – is met, the Court will examine each of the material facts the Creditor identifies as disputed.

The first such fact the Creditor identifies is that the Debtor properly represented the amount and type of debt he owed to the Creditor as of the petition date. SUMF ¶ 10. The Creditor argues that the amount the Debtor owed to it as of November 5, 2012 is in dispute. Opposition, pp. 2-4, 11-12; Response ¶¶ 10, 14. The Court finds the question of whether the Debtor properly scheduled the Creditor's claim in his bankruptcy schedules is a legal question and therefore is not a disputed fact for purposes of this Summary Judgment Motion. Moreover, to the extent the Creditor disputes facts underlying this legal issue, the Creditor has failed to identify any materials in the record to establish that dispute. Hence, the Court finds the Creditor has failed to establish the Debtor's scheduling of the Creditor's claim in the amount of $400,000, and as unliquidated, disputed, and contingent, is in dispute or precludes the Debtor from obtaining summary judgment relief.

The second fact the Creditor alleges to be in dispute is the Debtor's statement that he properly represented the amounts and existence of various other small business debts in his schedules. SUMF ¶ 27; doc. # 1. The Creditor argues that there was no reason for the Debtor to list those business debts in his bankruptcy petition and that he listed them for some improper purpose. Opposition, pp. 8, 11. The Court finds the question of whether the Debtor properly scheduled the small business claims in his bankruptcy schedules is a legal question and, to the extent the Creditor disputes facts underlying this legal issue, such as whether the Debtor is liable on these claims and the amounts due on them, the Creditor has failed to identify any materials in the record to establish that dispute.[2] Hence, the Court finds the Creditor has failed to establish that this is a disputed material fact.

---

[2]   The Creditor argues that the Debtor failed to produce invoices evidencing these business debts, despite the Creditor's request for their production at the Debtor's deposition. See Opposition, pp. 12-13. If the Creditor's position is that these debts do not exist, or are otherwise fraudulently scheduled, the Creditor has the duty to come forward with evidence to support that assertion. It has failed to provide significant probative evidence, such as an affidavit from a purported creditor, supporting such an argument. Alternatively, if the Creditor's position is that it was prejudiced by the Debtor's failure to provide copies of the invoices, the Creditor's appropriate remedy was a motion seeking an order compelling turnover of those invoices. The Creditor had ample time to file such a motion, and did not do so, prior to the closing of the discovery period. See doc. ## 27, 52 (setting schedule in adversary proceeding, including discovery).

4

The Debtor asserts that at the time he filed his petition, the Creditor claimed the Debtor owed it between $386,624.18 and $420,562.70. SUMF ¶ 25. The Creditor disputes this, arguing that at the time the Debtor filed his petition, he knew the Creditor was seeking only $128,000. Response ¶¶ 22-23, 25. However, the Creditor has failed to support the existence of this alleged dispute by citation to materials in the record, and therefore the Court treats this material fact as undisputed.

Next, the Creditor identifies the Debtor's assertion that his annual income at the time he filed his petition was $123,000 as a fact in dispute. See doc. # 1. The Creditor argues that the Debtor's total annual income as of the petition date was approximately $180,000. Opposition, p. 11. Again, though, the Creditor has failed to come forward with evidence sufficient to create a genuine dispute as to this material fact, and therefore the Court treats this material fact as undisputed.

A crucial and vigorously disputed fact, according to the Creditor, is whether the Debtor's debts are primarily business debts. Opposition, p. 4; Response ¶¶ 14, 27. The Court finds this cannot be the basis of a factual dispute because this is a legal, not factual, issue. If the Creditor intended to dispute facts underlying this legal issue, it failed to identify any materials in the record which establish facts related to this matter are in dispute. Hence, the Court finds the Creditor has failed to establish that this is a disputed material fact.

The Creditor asserts that the value of the subject real property at the time of the foreclosure sale is material to adjudication of the Motion to Dismiss, that the parties' dispute as to the property's value requires an evidentiary hearing, and therefore, that relief cannot be granted via summary judgment. Opposition, pp. 4, 15-17. This alleged factual dispute is germane to the allowance of the Creditor's claim, but is not material to the Motion to Dismiss. Even assuming for the purpose of this Summary Judgment Motion that there is a factual dispute as to the property's value, it would not preclude the Court from addressing the Motion to Dismiss through a summary judgment process. Thus, the Court finds the Creditor has failed to establish that this is a material fact.

The seventh and final fact the Creditor identifies as a disputed material fact is the Debtor's statement that he rents a six to seven hundred square foot apartment in Utah. SUMF ¶ 35. The Creditor alleges the Debtor's Utah apartment is a luxury unit located in a world-class ski resort community. Opposition, p. 8; Response ¶ 35. The Court finds the Debtor's factual representation is undisputed because the Creditor fails to support its position with citation to any materials in the record.

In sum, in each instance where the Creditor asserts one of the Debtor's "undisputed material facts" is disputed, either (1) the fact is not material, (2) the Creditor has failed to present significant probative

evidence that any genuine dispute of fact exists, (3) the materials upon which the Creditor relies do not

establish a dispute, or (4) the "disputed fact" is actually a legal argument.

## B. WHICH FACTS ARE MATERIAL AND UNDISPUTED?

Based upon the record in this case, and the Court's foregoing findings with regard to the Creditor's

allegations of disputed material facts, the Court finds the following facts to be material to the Summary

Judgment Motion, and undisputed.

*(i) Background Facts*

1. Prior to June 28, 2010, the Debtor held an interest in Hillside Associates, Inc. ("Hillside"), which
   owned real property located in the Town of Hartford, Quechee, Vermont (the "Property"); the
   Property was Hillside's sole asset, and it was the Debtor's intent to develop the Property. SUMF ¶
   2; doc. # 17-1; Response ¶ 2.

2. On or about June 28, 2010, the Debtor executed a note and mortgage in favor of Lake Sunapee
   Bank in the amount of $430,950.87. SUMF ¶ 3; doc. # 17-1; Response ¶ 3.

3. On September 15, 2011, Lake Sunapee Bank initiated a non-judicial foreclosure of Hillside's
   interest in the Property. SUMF ¶ 4; Response ¶ 4.

4. Prior to the foreclosure action, the note was sold to the Creditor and the Creditor was the highest
   bidder at the foreclosure auction. SUMF ¶ 4; Response ¶ 4; doc. # 57-2.

5. On or about June 8, 2012, the Creditor initiated a state court action against the Debtor to recover
   the deficiency between the amount owed on the note and the value of the property obtained at
   foreclosure. SUMF ¶ 5; Response ¶ 5; doc. # 57-3.

6. Prior to any judgment being entered by the state court, the Debtor filed a petition for relief in this
   Court, staying the state court deficiency action. SUMF ¶ 9; Response ¶ 9; doc. ## 1, 57-7.

*(ii) Facts Relating to the Debtor's Current Location and Occupation*

7. As of the petition date, November 5, 2013, the Debtor was employed by a company based in Salt
   Lake City, Utah. SUMF ¶ 28; Response ¶ 28.

8. The Debtor's job requires the Debtor to work with vendors located throughout the United States,
   on job sites throughout the United States. SUMF ¶ 30; Response ¶ 30.

9. Currently, the Debtor is working on projects located primarily in Utah, but historically the Debtor
   worked on projects in many states. SUMF ¶ 30; Response ¶ 30.

10. When practical, the Debtor performs his job functions from Vermont; the timing of when he is
    able to do so is largely dependent on the state of current projects. SUMF ¶ 31; Response ¶ 31.

11. The Debtor comes to Vermont as often as he can, and he stays in Vermont whenever his job requires him to be in the Northeastern United States. SUMF ¶ 32; Response ¶ 32.

12. The sole real property the Debtor owns is located in Vermont. The Debtor maintains his bank accounts at Heritage Family Credit Union in Rutland, Vermont, registers his vehicles in Vermont, has had a Vermont driver's license since 1983, votes in Vermont, has served on a jury in Vermont, and pays Vermont income and real estate taxes. SUMF ¶ 34; Response ¶ 34.

13. All of the Debtor's principal assets are in Vermont and were in Vermont for the one-hundred-eighty days preceding the petition date. SUMF ¶ 34; Response ¶ 34.

14. The Debtor rents an approximately six to seven hundred square foot apartment in Utah. SUMF ¶¶ 34, 35; Response ¶¶ 34, 35.

15. The Debtor and his wife use his home in Vermont solely as their residence; the Debtor does not lease his home or earn any rental income from this property. SUMF ¶ 36; Response ¶ 36.

16. The Debtor resides in Vermont without interruption for at least a couple of weeks in each season, as well as sporadic short trips as permitted by his work schedule. SUMF ¶ 37; Response ¶ 37.

17. The Debtor is unable to do his job within the state of Vermont on a day to day basis full time. SUMF ¶ 38; Response ¶ 38.

### (iii) Facts Relating to the Debtor's Finances

18. The Debtor listed personal property valued at $52,201.69 on Schedule B of his petition. Doc. # 1.

19. The Debtor listed real property located in Pittsfield, Vermont on Schedule A of his petition; this is the only interest in real property the Debtor listed. Doc. # 1.

20. In his Schedules D - F, the Debtor listed total liabilities in the amount of $589,917.45. Doc. # 1.

21. In his Schedule I, the Debtor listed his combined average monthly income, including his spouse's contribution, as $10,231, or $122,772 annually. Doc. # 1.

22. Post-petition, the Debtor received a bonus from his employer in the amount of approximately $35,000. This bonus is not reflected on the Debtor's Schedule I. Doc. ## 1; 57-8, pp. 95-96.

23. The bonuses the Debtor receives are based on the performance of projects he oversees, the Debtor has no knowledge of how the bonuses are calculated, and the bonuses are not guaranteed. Doc. # 57-8, pp. 44-47, 92-93.

24. In his Schedule J, the Debtor listed his average monthly expenses as $9,765, or $117,180 annually, leaving a monthly net income of $466. Doc. # 1.

25. The Debtor and his wife provided a personal financial statement (the "PFS") to Lake Sunapee Bank in late 2009. SUMF ¶ 11; Response ¶ 11.

7

26. The PFS identifies the Debtor's annual income to be $262,155; that figure includes $125,000 attributable to his salary, $60,000 attributable to his spouse's salary, $20,000 attributable to bonuses and commissions, $1,276 attributable to dividend income, and $65,879 attributable to pension and annuity income. Doc. # 57-9.

27. The PFS identifies the Debtor's assets as $31,940 in cash, $5,500 in readily marketable securities, $88,743 in accounts and notes receivable, $425,000 in residential real estate, $532,650 in partnership and PC interests, $2,500 in retirement accounts, and $400,000 in personal property. Doc. # 57-9.

28. The Debtor's valuation of assets on the PFS was the Debtor's estimation and may have been higher than the assets' actual fair market value. SUMF ¶ 15; Response ¶ 15; doc. # 57-8.

29. On or about July 18, 2012, the Debtor sold a 1981 Caper boat through a consignment agreement with an independent third party. The boat sold for $18,000, and the Debtor realized net income from the sale in the amount of $6,754.60. SUMF ¶ 17; Response ¶ 17; doc. # 57-11.

30. Other than the boat, the Debtor has not disposed of any assets between 2009 and the petition date. SUMF ¶ 17; Response ¶ 17.

31. The Debtor lost approximately $150,000 of his personal savings in the failed Hillside venture. SUMF ¶ 39.

32. The Debtor made no attempt during the two years prior to his bankruptcy filing to make significant lifestyle changes in anticipation of needing to file for bankruptcy relief. Doc. # 57-8, p. 83.

33. The annuity income listed on the PFS belonged to the Debtor's wife, who received it as an inheritance from her deceased parents. SUMF ¶ 19; Response ¶ 19.

34. The Debtor and his wife used all of the proceeds of the annuity to make loan payments to Lake Sunapee Bank. SUMF ¶ 20; Response ¶ 20.

*(iv) Facts Relating to the Debtor's Scheduling of the Creditor's Debt*

35. As listed in the Debtor's Schedule F, the Debtor's liabilities include approximately $160,000 of consumer debts and approximately $430,000 of business debts. Doc. # 1.

36. The Debtor completed Form B 22A, the "Means Test," by checking the box indicating the Debtor's debts are not primarily consumer debts. Doc. # 1.

37. In his Schedule F, the Debtor listed the Creditor's debt in the amount of $400,000, and listed it as contingent, unliquidated, and disputed. Doc. # 1.

38. The Debtor listed various other small business debts totaling approximately $30,000. Doc. # 1.

39. The Debtor scheduled those small business debts based on numbers the business creditors provided to him, either via invoice or otherwise. Doc. # 57-8, pp. 18-26.

40. The Debtor made no attempt to pay these debts prior to the petition date. Doc. # 57-8, pp. 18-26.

41. In its state court complaint filed June 8, 2012, the Creditor alleged that the deficiency amount the Debtor owed to it, as of April 11, 2011, was $420,562.70. SUMF ¶ 5; Response ¶ 5; doc. # 57-3, ¶ 11.

42. During state court proceedings, the Debtor consistently alleged that he did not owe the Creditor any deficiency. SUMF ¶ 7; Response ¶ 7; doc. # 57-5.

43. On or about November 19, 2012, the Creditor filed a motion for summary judgment in state court supported by an affidavit of a representative of the Creditor. That affidavit set forth the amount due to the Creditor as of that date to be $386,624.18, including interest accruing at 18% per year. SUMF ¶ 6; Response ¶ 6; Doc. # 57-4.

44. The parties participated in foreclosure mediation in state court and that mediation was not successful. SUMF ¶ 23.

45. On March 17, 2014, four months after the Debtor filed this Chapter 7 case, the Creditor filed a proof of claim in the amount of $128,000. Claim # 1-1.

46. The Debtor testified that he scheduled the Creditor's debt as $400,000, representing a distillation of the amounts the Creditor was seeking pre-petition, based upon the Creditor's representations in the state court filings and the information the Debtor had as of the petition date. SUMF ¶ 25; doc. # 57-8, pp. 12-16.

47. The Debtor would not have filed for bankruptcy relief but for the Creditor's debt. Doc. # 57-8, p. 80.

## C.  IS SUMMARY JUDGMENT PROPER ON A MOTION TO DISMISS BASED UPON LACK OF GOOD FAITH?

The Creditor argues that summary judgment is not appropriate in this case because the Motion to Dismiss calls into question the Debtor's intent, and therefore, the Court must weigh the Debtor's credibility in order to determine if the Debtor filed this case in bad faith, and the Court cannot evaluate the Debtor's credibility unless it holds an evidentiary hearing and observes the Debtor testifying. Opposition, p. 6. This argument fails.

It is proper to grant summary judgment on disputes turning on lack of good faith under § 707(a) when there are no material facts in dispute. See All Blacks B.V. v. Gruntruck, 199 B.R. 970, 976, (W.D. Wash. 1996) ); see, generally, Towle v. Hendrix (In re Hendrix) 352 B.R. at 204-205.  In Gruntruck, the district court affirmed the  bankruptcy court's grant of summary judgment denying creditor's motion to

dismiss for bad faith under § 707(a). The district court's rationale turned on its finding that there was no significant evidence supporting the creditor's allegations notwithstanding the fact that the creditor had had ample opportunities to discover additional facts at the trial level. The posture of the instant case is remarkably similar. Here, the Creditor had ample opportunity to engage in discovery but failed to present evidence sufficient to challenge any of the material undisputed facts the Debtor put forth. If the Creditor had established material facts were in dispute, the Court would need to conduct an evidentiary hearing to make factual findings, which, in turn, would indeed require the Court to make credibility determinations. But, since the Court has found the record includes all facts material to the § 707 issues before the Court, and there are no material facts in dispute, the Court can determine whether the Debtor is entitled to judgment as a matter of law based on the undisputed material facts. Therefore, the Court turns to the determination of whether the Debtor is entitled to judgment as a matter of law upon each of the grounds asserted in the Motion to Dismiss.

### D. HAS THE DEBTOR ESTABLISHED HE IS ENTITLED TO JUDGMENT, AS A MATTER OF LAW, ON THE MOTION TO DISMISS ALLEGATION OF IMPROPER VENUE?

The Creditor's first argument in favor of dismissal of the Debtor's case is that the District of Vermont is not a proper venue for this bankruptcy case. See Motion to Dismiss, pp. 13-14. The Creditor, without specifically invoking the relevant statute, alleges the Debtor is engaged in "forum-shopping," and this case should be venued in Utah. The Court must determine if venue is proper in this District before it can address the other legal issues raised by the Summary Judgment Motion.

The controlling statute, 28 U.S.C. § 1408, captioned "Venue of cases under title 11," provides, in relevant part, that a case under title 11 may be commenced in the district court (and, therefore, the bankruptcy court) for the district –

> (1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district;

28 U.S.C. § 1408. The parties disagree on the legal ramifications of the undisputed material facts pertaining to the Debtor's domicile and/or residence. The Debtor asserts that the undisputed material facts establish that the Debtor's residence/domicile is in Vermont, and therefore venue is proper, while the Creditor asserts that the undisputed material facts establish that the Debtor's residence/domicile is in Utah, and therefore venue is not proper. If § 1408 conditioned proper venue solely on the location of the Debtor's domicile and/or residence, this case would present a difficult and potentially novel question.

10

However, § 1408 provides four alternative bases for venue. "If it is established that the Debtor meets any one of the four tests (domicile, residence, principal place of business or principal assets), venue is proper . . ." In re Miller, 433 B.R. 205, 211 (Bankr. W.D. Mich. 2010) (emphasis in original); see In re Houghton Mifflin Harcourt Publ'g Co., 474 B.R. 122, 131 (Bankr. S.D.N.Y. 2012). Here, it is undisputed that the Debtor's principal assets were located in Vermont during the 180-day period specified under the statute. See Section B., supra, Undisputed Material Facts, ¶ 13 (hereafter "UMF"). Since it is undisputed that the Debtor's only real property, as well as his automobiles, bank accounts, and almost all of his personal property are located in Vermont, the Court need not determine where the Debtor's primary residence is located. Venue in this District is proper based on the location of the Debtor's principal assets.

Thus, the Debtor has established he is entitled to judgment, as a matter of law, on the venue allegations in the Motion to Dismiss.

### E. HAS THE DEBTOR ESTABLISHED HE IS ENTITLED TO JUDGMENT, AS A MATTER OF LAW, ON THE MOTION TO DISMISS ALLEGATIONS UNDER § 707(a)?

The Creditor's second argument in favor of dismissal is that the Debtor filed his petition in bad faith, and, therefore, this case should be dismissed "for cause" under § 707(a).[3] Motion to Dismiss, pp. 3-12. Section 707(a) provides that a court "may dismiss a case under this chapter only after notice and a hearing and only for cause" and sets out several examples of cause.[4] While this list does not include bad faith, courts in the Second Circuit regularly treat bad faith, or a lack of good faith,  as cause for dismissal under § 707(a).[5] See In re Aiello, 428 B.R. 296, 301-02 (Bankr. E.D.N.Y. 2010) (collecting authorities). In treating bad faith as cause for dismissal, these decisions follow the lead of the Sixth Circuit, which squarely held that lack of good faith is a basis for dismissal under § 707(a). In re Zick, 931 F.2d 1124, 1127 (6th Cir. Mich. 1991). In reading lack of good faith into the definition of "cause," the Zick court was clear that the bad faith conduct must be egregious to constitute a basis for dismissal under § 707(a):

> Dismissal based on lack of good faith must be undertaken on an ad hoc basis. It should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish life-style, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence.

Id. at 1129 (internal citations omitted).

---

[3]   All statutory citations refer to Title 11 United States Code (the "Bankruptcy Code") unless otherwise indicated.

[4]   The Creditor does not allege the case should be dismissed based on any of the examples of cause enumerated under § 707(a).

[5]   In the case law addressing this issue, the courts use "lack of good faith" and "bad faith" interchangeably. See In re Aiello, 428 B.R. at 301; In re Lombardo, 370 B.R. at 510.  For purposes of this opinion, this Court will do so as well.

In considering whether to dismiss a case based upon bad faith under § 707(a), courts in the Second Circuit have considered fourteen factors, first articulated by Judge Dorothy Eisenberg in In re Lombardo, 370 B.R. 506, 511-512 (Bankr. E.D.N.Y. 2007):

(1)  the debtor's manipulations having the effect of frustrating one particular creditor;
(2)  the absence of an attempt to pay creditors;
(3)  the debtor's failure to make significant lifestyle changes;
(4)  the debtor has sufficient resources to pay substantial portion of debts;
(5)  the debtor inflates expenses to disguise financial well-being;
(6)  the debtor is overutilizing protections of the Bankruptcy Code to the conscious detriment of creditors;
(7)  the debtor reduced his creditors to a single creditor in the months prior to the filing of the petition;
(8)  the debtor filed in response to a judgment, pending litigation or collection action; there is an intent to avoid a large single debt;
(9)  the unfairness of the use of Chapter 7;
(10) the debtor transferred assets;
(11) the debtor is paying debts to insiders;
(12) the debtor failed to make candid and full disclosure;
(13) the debts are modest in relation to assets and income; and
(14) there are multiple bankruptcy filings or other procedural "gymnastics."

Id. (internal citations omitted). The party moving for dismissal bears the burden of proving cause by a preponderance of the evidence. In re Aiello, 428 B.R. at 299. This Court concurs with the analysis enunciated in the Aiello case, and adopts the fourteen factor analysis set forth in In re Lombardo, 370 B.R. at 511-12. In the interest of thoroughness, the Court will consider whether the undisputed material facts of this case establish a cause for dismissal under each of the Lombardo factors (combining factors where appropriate), and then determine if, taking into account all of the factors germane to this case, the undisputed material facts establish grounds for denying the § 707(a) aspect of the Motion to Dismiss.

(i)  The Debtor's Motives for Pursuing Bankruptcy Relief and Manipulation of the Process: Lombardo Factors (1) and (8)

Factors one and eight of the Lombardo test focus, respectively, on whether the Debtor filed this petition with the intent to frustrate one creditor or to avoid a single large debt. The undisputed material facts establish (i) the Debtor did file his petition for relief in response to the Creditor's collection action, UMF ¶¶ 5-6; (ii) in filing this bankruptcy case, the Debtor intended to avoid the Creditor's large debt; (iii) the Debtor would not have filed for bankruptcy relief if not for his debt to the Creditor, UMF ¶ 47; and (iv) the Creditor's debt, as scheduled, represents approximately 68% of the Debtor's total liabilities, doc. # 1. Therefore, his conduct would suggest cause exists for dismissal under factor eight, when focusing on the intent and effect of his filing. However, the fact that a debtor files a Chapter 7 petition solely to avoid the large debt of a single creditor or to frustrate that creditor's collection efforts, standing alone, is not

enough to warrant a dismissal under § 707(a). See In re Aiello, 428 B.R. at 303; In re Glunk, 342 B.R.

717, 736 (Bankr. E.D. Pa. 2006); see also In re Grullon, 2014 Bankr. LEXIS 2238, *11 (Bankr. S.D.N.Y.

May 20, 2014) (collecting cases holding same). Rather, there must be evidence of an "intention to avoid a

large single debt based on conduct akin to fraud, misconduct, or gross negligence." In re Zick, 931 F.2d

1129 (emphasis added); see In re Lombardo, 370 B.R. at 509-10 (finding bad faith where debtor

continually misled creditor into supplying credit for four years and eventually sought to exempt the benefit

it received).

The Creditor's primary focus with regard to the first Lombardo factor is the Debtor's alleged

manipulation of his bankruptcy schedules. The Creditor argues the Debtor manipulated his schedules,

especially his list of liabilities, to avoid the presumption of abuse under § 707(b)(2)(A)(i),[6] and thus have

the right to discharge the Creditor's debt in Chapter 7. It argues that when the Debtor listed the Creditor's

claim as contingent, disputed, and unliquidated, in the amount of $400,000, the Debtor did so with the

intention of overstating the amount of the Creditor's claim, in order to create the inaccurate impression

that most of the Debtor's debts are business (rather than consumer) debts.[7] Additionally, the Creditor

argues that in listing various small business debts totaling approximately $30,000, the Debtor is

attempting to create a "smokescreen" designed to obscure the Debtor's other alleged manipulations. In

sum, the Creditor argues the Debtor's listing of the Creditor's claim at $400,000, and the composition of

the Debtor's list of debts generally, are inaccurate and substantiate the Creditor's assertion that the Debtor

has manipulated his schedules in order to frustrate the Creditor, and this compels a finding of bad faith

under the first Lombardo factor. The Debtor denies his schedules are inaccurate and denies he intended to

misrepresent his debts on his petition.

The Creditor claims that because the Debtor, in the context of the parties' state court litigation,

asserted he owed nothing to the Creditor, for the Debtor to now schedule the debt to the Creditor as

$400,000 is a disingenuous strategic "flip-flop" designed to relieve the Debtor of the obligation of

completing a Statement of Current Monthly Income and Means Test Calculation (Official Form 22A)

(hereafter the "Means Test"). The Creditor insists the Debtor should have scheduled the Creditor's debt

either as zero, consistent with the Debtor's claims in state court, or at some figure significantly lower than

$400,000, consistent with an estimation of the disputed claim using generally accepted accounting

---

[6]   For reasons discussed in detail in Section F., below, the presumption of abuse is only applicable if the Debtor's debts are
primarily consumer debts. The Creditor argues the Debtor manipulated his schedules to represent his debts as primarily non-
consumer debts, improperly avoiding this presumption of abuse.

[7]   The "tipping point," i.e., the point at which the Debtor's business debts outweigh his consumer debts, is approximately
$160,000. Because the Debtor's other business debts total approximately $30,000, if the Debtor's debt to Catamount is
scheduled at $400,000, the Debtor's debts are easily primarily business debts. If the Debtor's debt to Catamount is scheduled at
zero, or a lesser value such as, e.g., $128,000, the Debtor's debts are primarily consumer debts.

principles.[8] This argument fails. The undisputed material facts establish that the Debtor listed the Creditor's debt in the amount of $400,000 because the Creditor claimed this was the sum due in the papers it filed in state court, and the Debtor had no idea what amount the state court would determine to be due in a trial on the merits. UMF ¶ 46; doc. # 57-8, pp. 11-17, 30. Though the Debtor was unable to specifically identify the papers upon which he was relying in valuing the Creditor's claim for purposes of the bankruptcy case, the undisputed material facts demonstrate that in its state court complaint, the Creditor claimed a deficiency debt due from the Debtor, as of April 11, 2011, in the amount of $420,562.70. UMF ¶ 41; doc. # 57-8, p. 12. When the Creditor subsequently filed a motion for summary judgment in state court, it also filed an affidavit of the Creditor's representative which stated the amount due to the Creditor as of that date was $386,624.18. UMF ¶ 43.

The Court finds the undisputed material facts do not support the Creditor's allegation that the Debtor's listing of the Creditor's claim for $400,000 was either an act of bad faith or an intentional act to manipulate his schedules to harm this particular creditor. To be certain, it was to the Debtor's benefit to schedule the Creditor's claim as $400,000, rather than zero, with respect to the applicability of the Means Test. But simply because it was to the Debtor's benefit to do this does not establish that he did it in bad faith. Nor, as the Creditor declares, was the Debtor required to use generally accepted accounting principles or some alternative estimation method in completing his schedules. Rather, "[a] debtor has a duty to prepare schedules carefully, completely, and accurately. Although there are no bright-line rules for how much itemization and specificity is required, [a debtor is] required to be as particular as is reasonable under the circumstances." Cusano v. Klein, 264 F.3d 936, 946 (9th Cir. 2001) (internal citations omitted); see 4 Collier on Bankruptcy P 521.06 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014) ("Other facts must also be stated in the schedules, such as the amount of the debt and the consideration therefor.")

Neither party cites any case addressing the value a debtor should assign to a disputed, contingent, unliquidated debt in his or her bankruptcy schedules, or the role such claims play in the determination of whether the debtor has "primarily consumer debts." This is the most critical legal inquiry to be addressed in connection with the first Lombardo factor in this matter. There is, in fact, a bankruptcy case directly on point. In In re Reavis, 2007 Bankr. LEXIS 2617 (Bankr. N.D. Okla., July 30, 2007), the debtor filed a Chapter 7 bankruptcy petition in the midst of a state court suit brought by a creditor seeking damages. In amended schedules, the debtor scheduled that debt to have a value of $225,000 and declared it to be contingent, unliquidated, and disputed. As a result of assigning that value to the claim, the debtor's debts

---

[8]   The Creditor also argues that, based on his position in state court, the Debtor should be estopped from scheduling the debt in an amount other than zero. That argument is addressed separately below.

were primarily business debts. Id. at *7-9. The bankruptcy court held that the debtor scheduled the $225,000 figure in good faith, based upon its finding that the debtor believed the creditor would not accept any sum that was less than the creditor's expenditures for legal fees in that amount, and the creditor's refusal to settle for any sum less than that pre-petition. Id. The court also held that it is appropriate to include contingent, unliquidated, and disputed claims in the computation of whether the debts on a particular petition are primarily consumer debts:

> "Debt" means "liability on a claim," and "claim," in turn, is broadly defined as any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Under the Code, the fact that [a] tort claim may be unliquidated or disputed does not mean that it is not a claim. Thus, contingent, unliquidated and disputed debts are considered when determining whether a debtor's debts are primarily consumer debts.

Id. at *14 (internal citations and quotations omitted). In the case at bar, the undisputed material facts establish that the Debtor scheduled the debt in the amount of $400,000 based on the Debtor's understanding of the amount the Creditor was seeking as of the petition date. The value the Debtor attributed to the Creditor's claim ($400,000) is a close approximation of the figures the Creditor was actively seeking at the time the Debtor filed his petition ($420,562.70 and $386,624.18). Moreover, the record unequivocally establishes that those are the only two values the Creditor presented to the Debtor pre-petition, and the Debtor's uncontroverted testimony establishes the Debtor drafted his schedules based on those figures. Simply because the Debtor may have disputed his liability on this debt in state court does not establish the Debtor acted in bad faith in scheduling the claim for this amount in his bankruptcy schedules.

The Creditor argues that the Debtor should have scheduled the claim in the amount of $128,000, because this is the amount the Creditor would have accepted in satisfaction of its claim pre-petition. This argument is not supported by the undisputed material facts. While the Court is aware the Creditor filed a proof of claim in the amount of $128,000, the undisputed material facts indicate the Debtor was not aware, pre-petition, of the Creditor's willingness to accept that amount. Furthermore, the undisputed material facts do not establish the Creditor communicated to the Debtor its willingness to accept $128,000 in full satisfaction of its claim.[9]

This Court is persuaded by the Reavis analysis, and its conclusion that contingent, unliquidated and disputed debts must be considered when determining whether a debtor's debts are primarily consumer

---

[9] This is tacitly acknowledged in ¶ 22 of the Creditor's Response ("[the Creditor] might have accepted far less at some point during the deficiency action...") (emphasis added). The only evidence the Creditor provides in favor of this argument, namely a reference to what settlement offers the Creditor may have made in the process of state and federal settlement mediations, is, at best, inadmissible and, at worst, privileged under 12 V.S.A. §§ 5716-17.

15

debts. If Congress intended § 707(b) to omit contingent, unliquidated, and disputed debts, it could have specified that exception. It did not. The Creditor has not presented a persuasive legal argument that it was improper, as a matter of law, for the Debtor to schedule the full value he believed the Creditor was seeking for this contingent, disputed, unliquidated claim as of the petition date, or to include it in his computation of whether his debts were primarily consumer debts.

The Court turns next to whether the Debtor's inclusion of various small business debts in his bankruptcy schedules, totaling approximately $30,000, constitutes a basis for finding bad faith under the first Lombardo factor. The Creditor paints this as a disingenuous attempt by the Debtor to camouflage the true, primarily consumer, nature of his debts. However, the undisputed material facts establish the Debtor scheduled those debts based on balance due information the business creditors provided to him, either via invoice or otherwise. UMF ¶ 39. Moreover, the Creditor has not presented a cogent legal explication of how the Debtor's inclusion of these debt in his schedules advances the improper purpose the Creditor imputes to him. Additionally, even if the Debtor did not owe these small business debts, the Creditor's $400,000 claim (by itself) exceeds the amount of consumer debts listed in the Debtor's schedules. Based upon the undisputed material facts, and the parties' legal arguments, the Court concludes the inclusion of the small business debts does not evidence bad faith under this Lombardo factor.

In sum, the Court concludes that, as a matter of law, it was not bad faith conduct for the Debtor to schedule the Creditor's claim in the amount he understood it to be as of the petition date ($400,000), even though the Creditor now claims it would have accepted less, and even though the debt was contingent, unliquidated, and disputed as of the petition date. Nor was it bad faith for him to list other smaller business debts in his schedule of liabilities. Though the undisputed material facts are consistent with a finding of bad faith under the eighth Lombardo factor – that the Debtor filed this case in response to pending litigation with the intent to thwart a single creditor – they do not support a finding of bad faith under the first Lombardo factor. Rather than showing the Debtor intentionally manipulated his bankruptcy schedules to frustrate one particular creditor, as required under the first Lombardo factor, the undisputed material facts show the Debtor had a good faith reason for listing the Creditor's claim as contingent, unliquidated and contingent, and for listing it in the amount of $400,000, and further that the Debtor had a good faith basis for including the small business claims in his bankruptcy schedules.

(ii)  The Debtor's Pre-Petition Conduct: *Lombardo* Factors (2), (3), and (10)

The second, third and tenth Lombardo factors require the Court to analyze whether the Debtor's pre-petition conduct warrants a finding of bad faith, and ultimately, dismissal of this Chapter 7 case.

The second <u>Lombardo</u> factor focuses on the import of a debtor's failure to try to pay his creditors prior to seeking bankruptcy relief. The Creditor is correct that the undisputed material facts unequivocally show the Debtor made no attempt to settle his small business debts pre-petition, and the Debtor's only attempt to pay the Creditor was in the context of mandatory (and failed) mediation. UMF ¶ 40. The undisputed material facts also show that the Debtor disputed his liability on the Creditor's debt and that the Debtor chose to file for bankruptcy relief rather than try to pay the Creditor. UMF ¶¶ 6, 47. However, neither a debtor's failure to attempt to pay a genuinely disputed debt pre-petition, nor a decision to file for bankruptcy relief rather than continue litigating a matter in state court, is sufficient to warrant a finding of bad faith. <u>See</u> <u>In re Snyder</u>, 509 B.R. 945, 952 (Bankr. D.N.M. 2014) (stating that the debtor's failure to make any attempt to pay a default judgment of $170,854.09 was not evidence of bad faith); <u>see also</u> <u>In re Mazzella</u>, 2010 Bankr. LEXIS 4459 (Bankr. E.D.N.Y., Dec. 6, 2010).

Nor does the Debtor's failure to attempt to pay the small business debts support a finding of bad faith. As discussed above, the relevance of the small business debts to the Motion to Dismiss is questionable. Moreover, although the undisputed material facts establish the Debtor made no effort to pay many of those small business debts, UMF ¶ 40, they do not establish that this lack of effort was in bad faith. For example, there are no undisputed material facts showing the Debtor had sufficient means to make any payments to creditors or that he deliberately evaded collection efforts or accrued debts in anticipation of bankruptcy.

The third <u>Lombardo</u> factor focuses on whether the debtor made lifestyle changes pre-petition in order to pay some of his debts. The undisputed material facts establish that the Debtor made no attempt in the two years prior to his bankruptcy filing to make significant lifestyle changes in anticipation of the possibility that he might file for bankruptcy. UMF ¶ 32. Thus, the undisputed material facts appear to support a finding of bad faith under this factor. However, in analyzing this factor, courts have focused not on whether the debtor has made any change at all, but rather, on whether the debtor continues, despite mounting financial distress, to enjoy a lavish or extravagant lifestyle, ultimately at the expense of creditors. <u>See</u> <u>In re Snyder</u>, 509 B.R. at 951 (holding third <u>Lombardo</u> factor indicated good faith as "Debtor lives a modest lifestyle"); <u>In re Baird</u>, 456 B.R. 112, 117 (Bankr. M.D. Fla. 2010) ("the debtor made no life-style adjustments or <u>continued living a lavish life-style</u>") (emphasis added).

Here, the Creditor argues the Debtor's maintenance of two residences is an extravagance that falls within this factor. It alleges the Debtor's failure to relinquish one of his dwellings, when he found himself in financial strife and began to consider the need to seek bankruptcy relief, is a marker of bad faith. The undisputed material facts establish that the Debtor maintains a house in Vermont as well as an apartment

in Utah. Doc. # 1; UMF ¶¶ 12, 14, 19. This results in a total monthly housing cost of $4,274, including rent or mortgage payments, utilities, plus transportation to and from Vermont. Doc. # 1. The Creditor stresses that the Debtor's continued maintenance of his home in Vermont is an impractical and unnecessary expense, given that the Debtor's job requires the Debtor's physical presence in Utah during most of the year.

Ordinarily, a debtor maintaining two residences would be hard pressed to argue that both residences are necessary, and that having them is not a lavish extravagance. See Laine v. Gregory-Laine (In re Laine), 383 B.R. 166, 170 (Bankr. D. Kan. 2008) (dismissing case under § 707(a) where Debtor maintained lavish home in the U.S. despite living in Iceland at an additional cost of $2,500 per month). The Debtor's expenditure of over $4,000 – incurred because he maintains two residences – is certainly more than the "modest" lifestyle described in In re Snyder, 509 B.R. at 951, and is cause for concern and further inquiry.

Courts typically treat a housing expense as a per se luxury when a debtor resides where he or she works and travels to a second home, as in Laine. See 383 B.R. at 170. The instant case presents a rather different scenario, and may present the exception to the rule. The undisputed material facts establish that although the Debtor is currently working on projects located primarily in Utah, historically he has traveled extensively for work and been required to meet with vendors and visit work sites throughout the country. UMF ¶¶ 8-11. The Debtor cannot currently fulfill his job responsibilities working solely from Vermont, but work sometimes requires him to travel to the Northeastern United States, during which time he resides in his Vermont home. Id. The undisputed material facts also establish the Debtor does business in both locations, and has a legitimate purpose – and not just a decadent desire – for maintaining two residences.

Moreover, the Debtor's expenditures, even if well above subsistence level, are not the type of "lavish" expenditures that manifest bad faith conduct. For example, courts have found bad faith where a debtor encumbered his home with a second mortgage in an amount sufficient to pay all unsecured creditors but instead used the money to build a pool, In re Kamen, 231 B.R. 275, 279 (Bankr. N.D. Ohio 1999), or where debtors recklessly accumulated excess debt including multiple vacations, an expensive wedding for their daughter, and extensive home remodeling, In re Barnes, 158 B.R. 105, 108-109 (Bankr. W.D. Tenn. 1993).

Applying the relevant case law to the totality of undisputed material facts, the Court finds the Debtor intends to remain in Vermont and has the two residences primarily – if not solely – because of his work obligations, and although maintaining two residences at a total cost of $4,274 is certainly more than a modest lifestyle, the Debtor's expenditures are not the type of wantonly wasteful and reckless spending

18

that, even in the absence of other factors, constitute bad faith. Hence, the Court concludes that while the third <u>Lombardo</u> factor could support dismissal here, based upon the Debtor's failure to make lifestyle changes pre-petition, because the undisputed material facts do not show the Debtor had the luxurious lifestyle at which this factor is aimed, application of the third <u>Lombardo</u> factor does not, in and of itself, justify dismissal of the case.

The tenth <u>Lombardo</u> factor focuses on whether the Debtor improperly transferred assets pre-petition. The Creditor advances two arguments a propos of this factor, one general and one specific. Specifically, the Creditor argues that the Debtor's sale of a boat worth $50,000-$75,000 and his failure to disclose any details of that sale or distribution of the proceeds in his bankruptcy schedules is a legal basis for concluding the Debtor has acted in bad faith. The undisputed material facts, however, show the Debtor's sale of the boat occurred more than a year prior to the petition date, the purchaser was not an insider, the boat was sold for $18,000, and the Debtor realized only $6,754.60 in net proceeds. UMF ¶ 29; doc. # 58-11; doc. # 57-8, pp. 66-69. Thus, the undisputed material facts establish the boat was worth significantly less than the Creditor alleges, was sold in an arm's length transaction, and was not otherwise the subject of an improper transfer. Therefore, analysis of the undisputed material facts under the tenth <u>Lombardo</u> factor does not support dismissal of this case based on the Creditor's specific argument regarding the Debtor's alleged pre-petition dissipation of assets.

On a more general note, the Creditor argues that the Debtor must have transferred assets to the detriment of his creditors pre-petition because the personal financial statement the Debtor provided to Lake Sunapee Bank in 2009 listed $400,000 in personal property and the bankruptcy schedules before the Court list personal property worth only approximately $13,000. The Creditor asserts this dramatic diminution in the value of the Debtor's assets constitutes a solid legal basis for a finding of bad faith, either because the Debtor intentionally dissipated his personal property prior to filing his bankruptcy case or misrepresented his personal property holdings on the 2009 personal financial statement (as abbreviated above, "PFS").

The latter argument is misplaced. Subsection 523(a)(2) of the Bankruptcy Code provides the mechanism for addressing an allegation that a debtor obtained money through false pretenses. The Creditor could have filed a motion seeking to have its debt excepted from discharge under that provision, and did not do so. This Court will not permit a creditor to use § 707(a) as a general forum for litigating claims properly addressed under alternative sections of the Code. <u>See</u> <u>In re Grullon</u>, 2014 Bankr. LEXIS 2238 at *7-9 ("[M]ost of the Debtor's acts claimed to evidence bad faith are addressed specifically under

other provisions of the Bankruptcy Code and cannot properly constitute grounds for dismissal under a vague general equitable concept such as 'bad faith.'").

The Creditor's argument that the Debtor must have dissipated his personal property prior to filing for bankruptcy also fails, as inconsistent with the undisputed material facts. The Debtor admits the asset valuation in his PFS was an estimate and may have been too high. UMF ¶ 28. Further, the Debtor lost approximately $150,000 of his personal savings as a result of his failed Hillside business venture subsequent to the time he provided the 2009 PFS. UMF ¶ 31. The undisputed facts do not support a finding that the Debtor transferred – or may have transferred – any specific asset which would have diminished the value of his personal property to the detriment of creditors, nor that the Debtor's current assets are improperly valued. Thus, the Court concludes the undisputed material facts indicate there is no basis for a finding of cause to dismiss this case under the tenth Lombardo factor.

(iii)    The Magnitude of the Debtor's Debts in Comparison to Income and Ability to Pay:
Lombardo Factors (4) and (13)

The fourth and thirteenth Lombardo factors address whether the debtor has sufficient resources to pay a substantial portion of his debts, and whether his debts are modest in relation to his assets and income. The undisputed material facts show, as of the petition date, the Debtor had $466 of monthly disposable income (or $5,592 annually), relative to $458,644.45 of unsecured debt; stated differently, the ratio of the Debtor's total unsecured debts to his annual disposable income is 82 to 1.[10] Doc. # 1. With that income, over a 3 to 5 year period, i.e. in the context of a Chapter 13 plan, the Debtor could pay $16,776 to $27,960, or a 3.7% - 6.1% dividend to general unsecured creditors. This does not represent a substantial dividend to unsecured creditors. See In re Wise, 453 B.R. 220, 232 (Bankr. D. Vt. 2011) (holding 7.59% dividend did not represent substantial dividend) (citing In re Fitzgerald, 418 B.R. 778, 782 (Bankr. D. Conn. 2009) (holding 13% dividend not substantial)). However, as discussed in further detail below, the undisputed material facts also show the Debtor has the potential to earn annual bonuses, based on project performance at work. UMF ¶¶ 22 - 23. In fact, the Debtor received a bonus post-petition, in the approximate amount of $35,000. UMF ¶ 22; doc. # 57-8, pp. 95-96. If this were a Chapter 13 case, and that bonus were included as part of the Debtor's annual income, the Debtor would be able to pay $51,776 to $62,960, representing a dividend to unsecured creditors of 11.3% – 13.7%, depending on whether the

---

[10]    The Debtor's sole secured debts are first and second mortgages on his Vermont home, payments on which are already provided for in the calculation of the Debtor's monthly disposable income. Doc. # 1.

plan had a term of 3 or 5 years.[11] This is clearly a greater dividend than he could pay absent the bonus, but still not substantial.

Even if the Court were to conclude that the Debtor, with a $35,000 annual bonus and potential future bonuses, had the ability to pay a substantial dividend to his unsecured creditors over a 3 to 5 year period, other courts have consistently held that a debtor's ability to pay creditors, alone, is not enough to support a finding of bad faith. See In re Snyder, 509 B.R. at 951 (collecting cases holding same). Additionally, the Second Circuit has stated, based in part on § 707(a)'s legislative history, that "[i]f a creditor is permitted to base a motion for Chapter 7 dismissal on the debtor's ability to repay her debts, the debtor may have no other choice but to file a Chapter 13 petition (under which debtors are required to pay off their debts over a set period of time) or to avoid bankruptcy altogether, thus potentially creating a 'non-uniform mandatory Chapter 13.'" Smith v. Geltzer, 507 F.3d 64, 73 (2d Cir. 2007) (statutory citations omitted). [12] That analysis is very persuasive.

This concern is heightened where, as here, the Debtor's ability to pay a significant portion of his or her unsecured debts might constitute a basis for dismissal under § 707(b)(3)(B). See In re Baird, 456 B.R. at 121 (denying dismissal under § 707(a) where debtors may have had the ability to pay a substantial portion of unsecured debts as § 707(b)(3)(B) addresses the identical issue and was not applicable given debtors' primarily business debts). On balance, the Court is not persuaded that the undisputed material facts establish that (i) the Debtor could pay a substantial portion of his unsecured debts, or (ii) his unsecured debts are modest in relation to the Debtor's income. Thus, the Court concludes that neither the fourth nor thirteenth Lombardo factor support a finding of bad faith, and that these factors deserve only minimal weight in the Court's overall Lombardo analysis, in light of the Second Circuit's admonition against creating a non-uniform mandatory Chapter 13. See Smith v. Geltzer, 507 F.3d at 73.

(iv) The Debtor's Honesty in Completing Schedules: Lombardo Factor 12

The twelfth Lombardo factor, focused on whether the Debtor made candid and full disclosure in his bankruptcy case, is of monumental importance to the integrity of the entire bankruptcy system. This Court has previously stated that "[t]he duty of disclosure is a basic prerequisite to obtaining a discharge in

---

[11]   The Creditor has filed a proof of claim in this case in the amount of $128,000, thereby apparently waiving its right to collect any sum above that amount. This would reduce the total unsecured debt to $186,644.45, resulting in the Debtor's potential ability to repay 27.8% - 33.8% of his debts. However, as set forth above, the Debtor scheduled the Creditor's claim in the amount of $400,000 in good faith. Thus, in evaluating the Debtor's good faith in filing this case, the Court will use the values as set forth in the Debtor's schedules at the time the petition was filed.

[12]   In Smith v. Geltzer, the Second Circuit addressed whether this concern, and the legislative history of § 707(a), applied where a debtor voluntarily sought dismissal, and held that it did not. 507 F.3d at 72-74. However, in so holding, the Second Circuit contrasted the more typical scenario, involuntary dismissal, in which Congress's fear of enacting a non-uniform mandatory Chapter 13 makes sense, with voluntary dismissal, in which context such a risk does not apply.

any bankruptcy." Obuchowski v. Arnold (In re Arnold), 2005 Bankr. LEXIS 2167, *6 (Bankr. D. Vt.,

Nov. 4, 2005). Other courts have articulated similar sentiments:

> When a debtor files for bankruptcy protection, he or she has an affirmative duty to
> file accurate schedules and amended schedules. … Debtors must never lose sight of
> the fact that, ordinarily, they come into this court voluntarily and request relief,
> ultimately leading to discharge. The price for that discharge is timely, accurate and
> complete disclosure of all the information required by the Code.

Levine v. Hormovitis (In re Hormovitis), 2009 Bankr. LEXIS 5606, *14; see also In re Juzwiak, 89 F.3d

424, 427 (7th Cir. 1996) ("[D]ischarge in bankruptcy is a privilege, not a right, and should only inure to

the benefit of the honest debtor."). This Court considers a debtor's duty to file true and complete

schedules to be of immense significance when it evaluates whether a debtor has acted in bad faith.

The Creditor's sole allegation in regard to this factor is that the Debtor failed to accurately disclose

the amount of his income.[13] See Opposition, p. 11. As reflected in Schedule I, the Debtor's combined

average monthly income is listed as $10,231, or $122,772 annually. Doc. # 1, p. 22. The Court found

above the amount the Debtor listed as his annual income on Schedule I was legally correct as of the date

of the petition. UMF ¶ 21. That conclusion underlies the Court's analysis of the Creditor's legal argument

under the twelfth Lombardo factor.

The Court will address first the Debtor's failure to disclose the post-petition bonus either in his

bankruptcy schedules, at the time he filed his bankruptcy petition, or via an amendment to his bankruptcy

schedules, upon receipt of the bonus. There is no doubt that a debtor who deliberately conceals assets, i.e.,

property of the estate, has acted in bad faith. See In re Stancil, 2014 Bankr. LEXIS 394, *13-14 (Bankr.

E.D.N.C., Jan. 30, 2014) (finding bad faith where debtor received income pre-petition from corporations,

failed to disclose that income as well as the existence of two bank accounts and a pre-paid bank card, and

additionally failed to amend schedules); In re Marsico, 2004 Bankr. LEXIS 43, *21 (Bankr. D.N.H., Jan.

5, 2004) (debtor engaged in real estate "shell game" in systematic effort to shield nonexempt assets); see

also Redfield v. Waite (In re Waite), 2014 Bankr. LEXIS 3577, *13-14 (Bankr. N.D.N.Y., Aug. 22, 2014)

(declining to address § 707(a) based on denial of debtor's discharge, but finding debtor failed to disclose

remainder interest in real property, deposit accounts, and cash secreted in gun safe).

The legal question the undisputed material facts present under this factor is whether the bonus,

which the Debtor had not yet received as of the filing date, is property of the estate and thus property the

Debtor was required to disclose by filing amended bankruptcy schedules post-petition, upon receipt of the

bonus. Section 541 defines the scope of property of the estate. It includes:

> (1) [Except as provided otherwise], all legal or equitable interests of the debtor in
>     property as of the commencement of the case.
>     …
> (5) Any interest in property that would have been property of the estate if such
>     interest had been an interest of the debtor on the date of the filing of the petition,
>     and that the debtor acquires or becomes entitled to acquire within 180 days after
>     such date—
>     > (A) by bequest, devise, or inheritance;
>     > (B) as a result of a property settlement agreement with the debtor's spouse,
>     >     or of an interlocutory or final divorce decree; or
>     > (C) as a beneficiary of a life insurance policy or of a death benefit plan.
> (6) Proceeds, product, offspring, rents, or profits of or from property of the estate,
>     except such as are earnings from services performed by an individual debtor after
>     the commencement of the case. ...

11 U.S.C. § 541. The $35,000 bonus the Debtor received post-petition does not fall under any of these

categories: the Debtor did not have an interest in the funds as of the commencement of the case, the bonus

is not an interest in property of the type specified under § 541(5), and § 541(6) specifically excepts

earnings from services performed by the debtor after commencement of the case.[14] Thus, although the

better practice would have been for the Debtor to disclose the bonus once he received it, the Debtor's

failure to do so is not a breach of any duty imposed by the Bankruptcy Code or Rules. Moreover, since the

bonus is not property of this Chapter 7 estate, the Debtor's decision not to disclose it does not constitute a

lack of candid disclosure of assets, or a concealment of property he was required to list in his bankruptcy

schedules.

   Additionally, the Creditor asserts it was bad faith on the Debtor's part not to disclose his potential

for earning a bonus in Schedule I. On his Schedule I, he did not indicate he anticipated an increase (or

decrease) in income within the year following the filing of the petition. Doc. # 1, p. 22. The court in In re

Zick clearly held that where a debtor conceals sources of income, dismissal under § 707(a) is appropriate.

931 F.2d at 1129. In addition to the Debtor's general duty to fully disclose all current income, Schedule I

specifies (in Part 2 of that form) that a debtor should

---

[13]   Specifically, the Creditor argues that "[the] Debtor's total annual income . . . is approximately $180,000 but is shown as only
$123,000 in his bankruptcy petition because he did not include his annual end-of-the-year-five-figure bonus . . . by filing in
November." Opposition, p. 11. The Court treats this as an argument relating to disclosure under Lombardo factor (12) and
addresses it below, rather than as an argument under Lombardo factor (1), relating to Debtor's alleged manipulations, as the
Creditor does not advance any legal or factual basis for why it would have been manipulative for the Debtor to have filed in
November other than the Debtor's potential non-disclosure of anticipated income.

[14]   This outcome would be different were the Debtor filing under Chapter 13. Section 1306(a)(2) specifically includes such
earnings as property of the estate while the Chapter 13 case is pending. A debtor's failure to disclose the receipt of such a bonus
in Chapter 13 would undoubtedly be indicative of bad faith, absent some convincing evidence to the contrary.

> give details about the monthly income <u>you currently expect to receive.</u> Show all
> totals as monthly payments, even if income is not received in monthly payments. If
> your income is received in another time period, such as daily, weekly, quarterly,
> <u>annually, or irregularly,</u> calculate how much income would be by month, as described
> below.

Instructions to Official Form 6I (emphasis added). The Court is troubled by the Debtor's failure to

disclose the fact that he might receive a bonus, even without a specific figure, on his Schedule I. However,

the undisputed material facts establish the Debtor did not include an estimate of his bonus because the

bonuses are based on the performance of projects he oversees, the Debtor has no knowledge of how the

bonuses are calculated, and the bonuses are not guaranteed. UMF ¶ 23.

The Court concludes the Debtor's failure to list this potential bonus is not a sufficient basis for

finding the Debtor filed this case in bad faith. While the better practice here would most definitely have

been for the Debtor to disclose the possibility of a post-petition bonus, the undisputed material facts do

not support a determination that the Debtor scheduled his income – or failed to disclose his potential for

earning a bonus – reflects bad faith. Therefore, the Court concludes that the twelfth <u>Lombardo</u> factor does

not support a finding of cause for dismissal.

(v)  <u>Remaining Factors Inapplicable to Analysis of Whether the Debtor Filed in Bad Faith:</u>
<u>Lombardo</u> Factors (5), (6), (7), (9), (11), and (14)

None of the undisputed facts address, and the Creditor has not alleged, that the Debtor inflated his

expenses to disguise his financial well-being,[15] reduced his creditors to a single creditor in the months

prior to the filing of the petition, is paying debts to insiders, filed multiple bankruptcy cases, or engaged in

other procedural "gymnastics." Thus, none of these <u>Lombardo</u> factors support a determination that the

Debtor filed the instant Chapter 7 case in bad faith.

(vi)  <u>Summary of the <em>Lombardo</em> Factors Analysis</u>

Although the Court finds it unseemly for a person who cannot pay his debts to spend $4,274 per

month on housing – especially when it is to maintain two residences – in this case, the undisputed material

facts indicate the Debtor has a sound reason to do this and he is not doing so in bad faith. From a legal

perspective, the Court finds the Debtor's decision to maintain residences in both Vermont and Utah, under

the specific employment circumstances presented here, falls short of the "luxury" type of expense that

warrants denying a debtor from relief under Chapter 7. <u>See</u> <u>In re Zick</u>, 931 F.2d at 1129.

---

[15]  The Creditor's argument that the Debtor inflated his expenses, <u>Lombardo</u> factor (5), is addressed above under <u>Lombardo</u> factors (3) and (10). <u>See</u> Opposition, pp. 11-12. The Creditor also argues that the Debtor is overutilizing protections of the Bankruptcy Code to the conscious detriment of creditors, <u>Lombardo</u> factor (6). Opposition, p. 12. However, the Creditor does not make a specific argument under this factor, and refers instead to its arguments under other <u>Lombardo</u> factors, which the Court has already considered.

Similarly, the Debtor's decision to file bankruptcy primarily to avoid his debt to the Creditor also falls short of the "egregious" type of conduct that would support dismissal of the Debtor's case under § 707(a). While it is undisputed that the Debtor filed in response to the pending state court litigation, and that the Debtor filed in order to avoid paying his primary creditor's debt, there is no evidence demonstrating the Debtor's intention to avoid his debt "based on conduct akin to fraud, misconduct, or gross negligence." In re Zick, 931 F.2d 1129.

In sum, application of the Lombardo factors to the undisputed material facts in this case, the Court finds the third and eighth Lombardo factors, namely the Debtor's failure to make significant lifestyle changes and the Debtor's filing in response to litigation with the intent to avoid a single large debt, may constitute bases for a finding the Debtor acted in bad faith in filing this case. However, the Court must take into account all of the undisputed material facts of the case and consider all of the pertinent Lombardo factors. After so doing, the court finds that these two factors alone are insufficient to justify dismissal under § 707(a). The Court further finds that the Debtor has met his burden in establishing he is entitled to judgment as a matter of law, with respect to the Creditor's request to dismiss this case under § 707(a).

## F.  HAS THE DEBTOR ESTABLISHED HE IS ENTITLED TO JUDGMENT, AS A MATTER OF LAW, ON THE MOTION TO DISMISS BASED ALLEGATIONS UNDER § 707(b)?

The Court turns next to the Creditor's argument under §707(b).[16] In its Motion to Dismiss, the Creditor requests the Court dismiss the Debtor's petition as an abuse of the provisions of Chapter 7, pursuant to 11 U.S.C. § 707(b). The Creditor proffers two arguments in support of dismissal under § 707(b)(1). First, the Creditor argues that the presumption of abuse should arise under § 707(b)(2)(A). Second, even if the presumption of abuse does not arise, the Creditor argues that the totality of the circumstances reveals the Debtor's petition to be an abuse of the provisions of Chapter 7. See 11 U.S.C. § 707(b)(3).

Section 707(b)(1) provides:

> After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter.

Section 707(b)(1)(emphasis added). In turn, § 707(b)(2)(A)(i), provides:

---

[16]  Although the Debtor focuses most of his attention in the Summary Judgment Motion on § 707(a), the Summary Judgment Motion seeks denial of the Creditor's Motion in all respects.

> In considering under paragraph (1) whether the granting of relief would be an abuse
> of the provisions of this chapter, the court shall presume abuse exists if [Official
> Form B22A or C so indicate][17]...

Section 707(b)(2)(A)(i). Finally, § 707(b)(3) provides:

> In considering under paragraph (1) whether the granting of relief would be an abuse
> of the provisions of this chapter in a case in which the presumption in paragraph
> (2)(A)(i) does not arise or is rebutted, the court shall consider–
>
>> (A) whether the debtor filed the petition in bad faith; or
>>
>> (B) the totality of the circumstances ... of the debtor's financial situation
>>     demonstrates abuse.

Section 707(b)(3). Section 707(b) is applicable only if the Debtor's debts are primarily consumer debts, [18] and only then may the Court consider whether the granting of relief would be an abuse of Chapter 7. See In re Sekendur, 334 B.R. 609, 618 (Bankr. N.D. Ill. 2005); In re Mooney, 313 B.R. 709, 713 (Bankr. N.D. Ohio 2004). This is why Official Form B 22A provides a method to indicate a debtor's debts are primarily business debts, and instructs the debtor, if so, to immediately proceed to the bottom of the form. Here, the Debtor checked the box on Form B 22A indicating his debts are primarily business debts, thereby avoiding the presumption of abuse which otherwise could have arisen under § 707(b)(2)(A)(i). See Doc. # 1.

This Court has already determined that the Debtor's scheduling of the Creditor's debt was not done in bad faith, and that scheduling it in the amount of $400,000 was not an inappropriate value to attribute to the Creditor's claim at the time the Debtor filed his petition. However, the Creditor advances two arguments that, irrespective of the Debtor's good faith or lack thereof, he must be treated as a debtor who has primarily consumer debts.

In this regard, the Creditor argues the Debtor should be judicially estopped from scheduling the Creditor's debt in an amount other than zero. Judicial estoppel is an equitable doctrine which holds "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." Adelphia Recovery Trust v. HSBC Bank USA (In re Adelphia Recovery Trust), 634 F.3d 678, 695 (2d Cir. 2011) (internal citations omitted). "Typically, judicial estoppel will apply if 1) a party's later position

---

[17]   Section 707(b)(2)(A)(i) sets forth a complicated statutory framework for determining whether the presumption of abuse arises, commonly known as the "means test." As a practical matter, debtors complete the calculations set forth in Official Form B 22A (in Chapter 7) or C (in Chapter 13) to determine whether the means test establishes a presumption of abuse.

[18]   Most courts agree that "primarily" means greater than 50% in aggregate value. See In re Hlavin, 394 B.R. 441, 446 (Bankr. S.D. Ohio 2008) ("[t]he majority view is that a debtor's liabilities are primarily consumer debts if the aggregate dollar amount of such debts exceeds 50% of the debtor's total liabilities"); see also In re Grullon, 2014 Bankr. LEXIS 2238.

is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." Id. (internal citations omitted); see Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 170 (U.S. 2010) (declining to apply judicial estoppel where party had not succeeded in persuading first court to accept party's earlier position, as judicial acceptance of position asserted in later proceeding would not create perception that either first or second court was misled). Judicial estoppel is inapplicable here for two reasons. First, the Debtor's position is not clearly inconsistent with his position in state court. The Debtor scheduled the Creditor's debt in the amount of $400,000, indicating that the debt was contingent, disputed, and unliquidated. Identifying the maximum liability of the claim, while noting that it is disputed and unliquidated, is not clearly inconsistent with the Debtor's position in state court where the Debtor disputed his personal liability for this debt. More importantly, the state court did not issue a final order determining the amount of the liability. At the time the Debtor filed his bankruptcy petition, the state court litigation was open and the Debtor and Creditor had dramatically different perspectives on the nature, validity, and amount of the Debtor's liability. Here, there is no danger that if this Court accepts the Debtor's scheduling of the Creditor's claim in the amount of $400,000, it will create a perception that this Court or the state court was misled. The pleadings filed in both courts make abundantly clear that there is a dispute between the parties as to the amount the Debtor owes to the Creditor. Accordingly, the Court finds the doctrine of judicial estoppel to be inapplicable.[19]

Alternatively, the Creditor urges the Court to determine the actual value of the claim – either by accepting the amount set forth in the Creditor's proof of claim or by conducting an evidentiary hearing – and to use that value in computing what portions of the Debtor's debts are consumer debts and what portions are business debts. Essentially, this argument centers around timing and the Creditor's change in position as to the amount it claims due from the Debtor. Subsequent to its arguments in state court, the Creditor decided it would accept $128,000 from the Debtor in full satisfaction of the balance due, and insists that the Debtor must use this figure in computing the nature and amount of his debts. The undisputed material facts establish the Debtor was not aware of this change in the Creditor's position until after he filed his bankruptcy petition and the amount he listed in his schedules was the last figure he had from the Creditor. UMF ¶ 46; doc. # 57-8, pp. 11-17, 30. This is crucial because if the value of the Debtor's debts as of the petition date are used – i.e., the Creditor's claim is treated as a contingent, unliquidated, disputed claim in the amount of $400,000 – then most of the Debtor's debt (approximately

---

[19]   Assuming, arguendo, that the Court did apply the doctrine of estoppel to the instant case, the Court would apply it equally to both parties, not solely the Debtor. This would result in an absurdity – both parties being bound to support positions contrary to their current best interests.

$430,000 of $589,917.45) are business debts, and § 707(b) does not apply. If, instead, the lower claim amount the Creditor is seeking post-petition, $128,000, is used, then the Debtor's debts would not be primarily business debts (approximately $158,000 of $317,917.45), and § 707(b) might apply.

Section 707(b) is applicable to "an individual debtor under [Chapter 7] whose debts are primarily consumer debts." The section itself provides no guidance as to when that determination should be made, nor does any other potentially relevant section – such as § 101(12), defining debt, or § 101(5), defining claim – specify the date on which this determination is made. Case law on this issue is similarly sparse; neither party has cited any case law in support of their position, and the Court is aware of only one case that has examined the issue. In In re Mohr, 425 B.R. 457, 461 (Bankr. S.D. Ohio 2010), the bankruptcy court observed the paucity of § 707 case law on this point and therefore, when it was presented with this question, it relied on the Sixth Circuit's analysis of a timing question on a related bankruptcy issue, citing Comprehensive Accounting Corp. v. Pearson (In re Pearson), 773 F.2d 751, 756-58 (6th Cir. 1985). In Pearson, the Sixth Circuit considered the scope of judicial inquiry when making a threshold debt calculation under § 109(e), which establishes the eligibility requirements for an individual to be a debtor under Chapter 13, notably including limits on the amount of non-contingent, liquidated unsecured and secured debts. The Sixth Circuit held that when making a threshold eligibility determination, a court should rely primarily on the debtor's schedules, focusing only on whether the schedules were filed in good faith. Id. It reasoned that a court's threshold inquiries must consider the debtor's debts as they exist at the time of filing – not at the time the debtor's right to relief is challenged or at the time of a hearing. Id. Additionally, it specifically found that the more extensive post-petition proceedings needed to make ultimate conclusions about the precise nature and extent of debts, such as rulings on objections to claims, are immaterial in determining a debtors' eligibility on the date the petition was filed. Id. Turning to policy considerations, the Pearson court underscored that threshold determinations about eligibility for relief should not dominate or unduly delay the case, since the resources of the debtor are limited, and therefore, when the Code gives no guidance, courts should determine eligibility for relief using the facts available on the date of the petition, as that is the approach which will consistently be the most efficient and inexpensive. Id.

Based in part on § 704(b) and Federal Rule of Bankruptcy Procedure 1017(e), both of which set forth strict time limits for parties to file § 707(b) motions, the Mohr court concluded that the determination of the applicability of § 707(b) is a similar type of threshold inquiry. 425 B.R. at 462-64. It concluded the same limited, petition date inquiry should govern the applicability of § 707(b), and relied primarily on the debtor's schedules, subject to an examination of the debtor's good faith, if necessary. Id.

28

Case 13-10775   Doc    74   Filed 11/04/14   Entered    11/04/14 16:42:47
      Desc    Main Document         Page    29 of 30

Although the court cautioned that "a debtor must accurately calculate a debt for these purposes as it exists on the date the petition is filed or face objections, and an independent review by the court, prompted by any indicia that his or her calculation is not in good faith or is not an accurate measure of the debt," the court held that such an independent review would consider only evidence that shed light on the debt as it existed on the petition filing date. Id. at 463; see In re Hatzenbuehler, 282 B.R. 828, 833 (Bankr. N.D. Tex. 2002) (holding that a debtor's schedules may be an imperfect measure of debt and, consequently, a court may consider other evidence and post-petition developments "to the extent (and only to the extent) they shed light on the amount of . . . debt actually owed by the debtor at the time of the filing of the petition").

This Court finds the Mohr court's reasoning to be sound and persuasive. Therefore, the Court adopts the holding set forth in Mohr, and concludes that, in making a determination as to the applicability of § 707(b), the Court should consider the Debtor's debts as they existed at the time the petition was filed, primarily as evidenced by the Debtor's schedules, subject to an independent review of the Debtor's good faith by the Court when necessary. The Court has considered carefully the Creditor's allegations that the Debtor lacked good faith in filing his schedules, and in particular, the assertion the Debtor intentionally understated his income and overstated his liability to the Creditor, to misrepresent his eligibility for Chapter 7 relief, and has found them unavailing. Based upon this finding, and its determination that the petition filing date is the date upon which to rely when measuring the nature and amount of a debtor's debt for purposes of § 707(b), the Court concludes the Debtor's debts are primarily business debts, and therefore, § 707(b) is not applicable to this case. Accordingly, the Creditor's arguments in favor of dismissal under § 707(b) fail as a matter of law, and the Debtor's Summary Judgment Motion is granted with respect to the Creditor's Motion to Dismiss under § 707(b).

## VI. CONCLUSION

For the reasons set forth above, the Court reaches the following findings and conclusions.  First, it finds there are no material facts in dispute and summary judgment is proper.  Second, the Court finds that venue of this case in Vermont is proper and therefore that the Debtor is entitled to judgment, as a matter of law, on the Creditor's motion for dismissal based upon improper venue. Further, after scrutinizing the undisputed material facts in the framework of the Lombardo factors, the Court finds there is not cause to dismiss the case under § 707(a) for bad faith, and therefore the Debtor is entitled to judgment, as a matter of law, on the Creditor's request for relief under § 707(a). Additionally, the Court finds the Debtor's debts are primarily business debts, and consequently, § 707(b) does not apply to this case, and the Debtor is entitled to judgment, as a matter of law, denying the Creditor's request to dismiss this case under § 707(b).

29

Having found that the Debtor is entitled to judgment as a matter of law on all grounds enunciated in the

Creditor's Motion to Dismiss, the Court grants the Debtor's Summary Judgment Motion in its entirety,

denies the Creditor's Motion to Dismiss, and authorizes the Debtor to obtain relief under Chapter 7.

   This memorandum of decision constitutes the Court's findings of fact and conclusions of law.

November 4, 2014                                                 Colleen A. Brown
Burlington, Vermont                                              United States Bankruptcy Judge